STATE OF CONNECTICUT  }
                     } ss:
COUNTY OF FAIRFIELD   }

## AFFIRMATION IN LIEU OF AFFIDAVIT

The undersigned, Marshall Caro, swears and affirms that this affirmation and all statements herein are truthful and accurate, are made from my own personal knowledge and are made under penalty of perjury, and I am competent to testify concerning all of the facts set forth herein.

1. I am above the age of twenty-one (21) years and believe in the value of an oath.

2. I reside at 47 Angelus Drive in the Town of Greenwich, Connecticut.

3. I submit this Affirmation in support of my motion for summary judgment which is being filed in the matter of Caro v. David Weintraub, et al, Docket Number 3:09-cv-01353 (PCD) currently pending in the U.S. District Court for the District of Connecticut.

4. I am the widower of Elizabeth Anne Caro who succumbed to cancer on the 6th of February, 2008 after a long illness. Elizabeth was the matriarch of her immediate family – her sons, the defendants Eric and David Weintraub, and younger brothers, James and Thomas Corrigan. Elizabeth's mother died when Elizabeth was six years old and Elizabeth became the surrogate mother to her siblings. This posture continued throughout her life. Elizabeth would continually deplete her savings (sometimes to exhaustion) to lavish gifts and to provide economic support to her sons and her youngest brother, Thomas. One result of this is that both of her adult sons and Thomas were financially dependent on Elizabeth.

5. In early 2007, Elizabeth had complained of continuing fatigue and "night sweats" and of a lump in her neck that "wouldn't go away". Elizabeth saw a physician in or around February of 2007 who ordered CT scans and then an MRI and referred Elizabeth to an oncologist. Elizabeth was diagnosed with Stage IV lung cancer with a metastasis in her brain and was to die within a year. I was Elizabeth's sole caregiver and took her to every doctor's appointment and treatment in Manhattan and Connecticut. I basically shut down my business to care for Elizabeth.

6. Elizabeth's conditioned worsened and she weakened in the ensuing months and Thomas and Eric and David grew increasingly worried about their respective financial situations. They continued to be dependent on Elizabeth and feared for their financial future.

7. Thomas and Eric and David came to our home several times in the fall of 2007 and engaged in arguments with Elizabeth about their financial future and what she would leave to them upon her death.

8. Thomas drafted several wills for Elizabeth that claimed she was the sole owner of our home and would have bequeathed to me only the Connecticut Statutory minimum spousal distribution from her estate – a one third lifetime interest. Among the provisions in the drafts was his appointment as her executor and the establishment of "spendthrift trusts" for Eric and David. These provisions would have ensured a steady income stream for Thomas.

9. These draft wills were contrary to Elizabeth's intentions and she repeatedly told Thomas that she owned only a minority share in our partnership in our home and that she intended to divide her financial assets equally, with half going to me and half divided equally between Eric and David.

10. Elizabeth's conditioned worsened markedly after Christmas in 2007 and she was hospitalized several times in January of 2007. The end was near.

11. In the early afternoon of Saturday February 2nd, 2008 my step-sons and in-laws arrived at our home, unannounced and uninvited.

12. The practice for the boys to visit was for them to phone a few days in advance and make arrangements. Thomas and Lynn Corrigan followed the same practice. In this instance, for the first time ever, all parties arrived at our home unannounced and without prior notice or invitation.

13. I awakened Elizabeth to receive our visitors, placed her in her wheel chair and brought her from our bedroom to the kitchen, still attached to her oxygen tether. Elizabeth was extremely frail and on several medications and in no condition to withstand the stress her brother and sons intended to cause her. Elizabeth died four days later, succumbing to lung cancer that had ravaged her body.

14. Lynn Corrigan, Elizabeth's sister-in-law with whom she enjoyed a close relationship, came into the kitchen and immediately engaged Elizabeth in a conversation – seeking to get her to sign the latest draft will prepared by Lynn's husband Thomas Corrigan in lieu of the will being prepared by our estate planner, Cummings and Lockwood. This "draft will" named Thomas

Corrigan as the executor and contained several provisions objectionable to Elizabeth, notably provisions that would have had Elizabeth claim ownership of our home in entirety and bequeathing to me only the statutory spousal minimum one-third life interest in her estate.

15. This was not the first time Thomas Corrigan had harangued Elizabeth and caused her great distress about the will Elizabeth intended to sign. During Elizabeth's second hospitalization in January of 2008, Elizabeth asked me to keep her brother Thomas away from her because of his incessant badgering about the will. I conveyed this information to Lynn Corrigan and both she and Thomas Corrigan became angry and abusive towards me directly outside of Elizabeth's hospital room. I then advised them to leave the hospital before obliging me to call the attending medical staff for assistance.

16. Elizabeth became exhausted after about twenty minutes and expressed her weariness to me and asked to be taken back to bed. I wheeled Elizabeth back to our bedroom and put her into bed. Within minutes, all the visitors left.

17. Elizabeth was visibly distressed following the visit and expressed to me that she wanted to finish putting her affairs in order. Elizabeth rested the remainder of Saturday, February 3rd, 2008, arising only to visit the bathroom and to take some tea and nourishment. On Sunday, Elizabeth and I completed filling out a financial questionnaire provided to us by our estate planner.

18. On Monday, February 4th, Elizabeth and I discussed our plans for her funeral services and who should speak. Elizabeth wished that I would read the Emily Dickenson poem, "Death", and that her childhood friend, Eileen Theiss should speak of their long friendship.

19. Elizabeth was very upset with her sons and expressed that they should learn to take care of themselves. Elizabeth told me that she wanted to repay to me my share (half) of the wedding loans we had extended to her sons in 2007 which had not been repaid. In the late evening of Monday, February 4th, Elizabeth asked me to bring the laptop computer into the bathroom because she didn't feel well enough for me to bring her into our kitchen.

20. That evening or early the next morning, Elizabeth told me she had put back $25,000 from her personal account into our joint account to cover my share of the loans we had extended to her sons.

21. The following morning I made tea and toast for Elizabeth. She ate very little and expressed extreme fatigue. She quickly fell asleep.

22. In the days prior to this, Elizabeth slept fitfully – never more than a couple of hours at a stretch before wakening. This day, she did not awaken again. Her breathing became uneven and I tried to rouse her, but could not. I telephoned the nurse in charge of her care, who came to our home in the early afternoon.

23. The nurse advised me that this was the end, that Elizabeth would not awaken again. I telephoned Elizabeth's family and several members came to sit vigil with me.

24. Elizabeth did not regain consciousness and died the following day, February 6th, 2008.

25. I was alone with Elizabeth and I am the only person she saw or spoke to from Sunday, February 3rd, 2008 until her death on Wednesday, February 6th, 2008.

26. It was the custom of Elizabeth and myself to use our joint checking account to effect monetary transfers between us. I attach hereto a spreadsheet of our deposits, withdrawals, and transfers. I created this spreadsheet from the banking statements – which I also attach on a CD -- of our joint checking account and my personal account. These exhibits show all of the transfers Elizabeth made to and from her personal checking account and our joint checking account.

27. At no time did I ever make any transfers from Elizabeth's personal checking account to our joint checking account.


Marshall Caro

By: _____  3/8/12

Marshall Caro
47 Angelus Drive
Greenwich, CT 06831

## EXHIBITS

Exhibit 1 – Marshall & Elizabeth Caro joint checking deposits, withdrawals, and transfers, culled from the banking statements provided in Exhibit 2.
Exhibit 2 – Banking Statements of the joint checking accounts held by Elizabeth and Marshall Caro (compact disc).